COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Ortiz, Raphael and Senior Judge Annunziata
Argued at Fairfax, Virginia


YOHANNES NESSIBU

v.      Record No. 1368-23-4

COMMONWEALTH OF VIRGINIA
                                                    MEMORANDUM OPINION[*] BY
                                                 JUDGE ROSEMARIE ANNUNZIATA
YOHANNES NESSIBU                                        AUGUST 12, 2025

v.      Record No. 1370-23-4

COMMONWEALTH OF VIRGINIA



                    FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                              Michael F. Devine, Judge

          Philip Andonian (Christopher Leibig; CalebAndonian, PLLC; The
          Law Offices of Christopher Leibig, on briefs), for appellant.

          Victoria Johnson, Senior Assistant Attorney General (Jason S.
          Miyares, Attorney General, on brief), for appellee.


       The Commonwealth charged Yohannes Nessibu (Nessibu) with two counts of

first-degree murder and two counts of use of a firearm in the commission of a felony arising

from the double homicide of Kedest Simeneh (Simeneh) and Henok Yohannes (Henok).  After

the trial court granted Nessibu's motion to sever the charges, one jury convicted him of

first-degree murder and use of a firearm in the commission of a felony related to Simeneh's

homicide, while a second jury convicted him of voluntary manslaughter and use of a firearm in

the commission of a felony related to Henok's homicide.  On appeal, Nessibu contends that the

---

[*] This opinion is not designated for publication.  See Code § 17.1-413(A).

trial court violated his constitutional rights to testify in one trial and remain silent in the other by permitting the Commonwealth to try him for the second homicide first. He also contends that the trial court abused its discretion in evidentiary rulings and by refusing his proposed jury instruction during the first trial. But Nessibu's arguments are not preserved for appeal and otherwise fail to demonstrate reversible error. Accordingly, the trial court's judgment is affirmed.

BACKGROUND

"On appeal, we state the facts in the light most favorable to the Commonwealth," the prevailing party below. *Newsome v. Commonwealth*, 81 Va. App. 43, 48 (2024) (citing *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021)). On the afternoon of December 22, 2016, Jacob Dalton and his friend, Nessibu, smoked marijuana together. After they finished, Nessibu wanted to replenish his marijuana supply and asked Dalton to drive him to his marijuana supplier, Henok. On the way to Henok's house later that evening, Dalton and Nessibu picked up two other passengers: Simeneh and Hassan Kamara. Simeneh was "good friends," perhaps "closer than friends," with Henok. And Kamara was another of Dalton's friends. Nessibu sat in Dalton's front, passenger seat, while Simeneh and Kamara sat in the back seat.

Following Simeneh's directions, Dalton drove toward Henok's neighborhood. Henok lived in a house with his parents and younger brother, Nebiyu Girma; Henok lived in the basement and sold marijuana to his "close friends." Girma testified that nobody in his house owned guns. Another of Henok's close friends also testified that she had "never seen Henok with a firearm."

After reaching Henok's neighborhood, Dalton parked on the street near Henok's house, and Simeneh asked Nessibu for money to buy the marijuana. Nessibu refused, and Simeneh eventually left the car and walked towards Henok's house. After 10 or 15 minutes, Simeneh called Nessibu,

and they argued about "the purchase." Nessibu left the car and walked "in the same general direction" as Simeneh. Kamara then climbed into the front, passenger seat and talked with Dalton.

After about 30 more minutes, Dalton saw Nessibu and Simeneh running back to his car. Although Dalton had not seen Nessibu with a gun previously, he was now holding a "black pistol" in one hand. His other hand held Simeneh's hand as they ran, and she was "behind him following." Dalton was "confused" about "why they were running," and when they reached the car, Nessibu hurriedly "pushed" Simeneh inside even though it did not "appear that she wanted to get in the car." At trial, Dalton testified that Nessibu entered the car and said, "I hit him. I hit him. Drive off."[1] Simeneh was "distraught," "crying," and "emotionally disturbed." She said, "He shot him. He shot him four times. He shot him in the head. He's dead."

Dalton told everyone to "get out" of his car, and Kamara and Simeneh started to do so, but Nessibu "point[ed]" the "weapon" at Dalton, told everyone to "get in" the car, and demanded that Dalton drive. Dalton complied, following Nessibu's directions for about ten minutes until they reached an unfamiliar residential area. Nessibu told Dalton to stop in a cul-de-sac surrounded by single-family homes. Nessibu then exited the car and "pull[ed]" a reluctant Simeneh out with him. It was "dark," around 8:00 p.m., and Dalton drove away immediately.[2]

Around 8:00 or 9:00 p.m. that night, Robert and Elaine Snyder were at their home, which was about a ten-minute drive from Henok's house. Robert was watching an action movie while Elaine washed dishes. Elaine "heard a noise that startled" her from her backyard. The noise was

---

[1] When Dalton spoke to police about a week later in a recorded conversation, he reported that Nessibu had stated, "I hit him. I hit him. He rushed me. I hit him." At trial, Nessibu played that portion of the recording for the jury.

[2] Dalton saw news about the incident the next day but did not contact the police. Instead, the police contacted him about a week later, and he spoke to them after he was granted complete immunity. He understood that despite that immunity, he could be "prosecuted for perjury" if he did not testify truthfully during Nessibu's trials.

"like a pop," and she suspected it might have been "fireworks." But around 9:00 a.m. the next morning, Elaine and Robert looked out of their kitchen window and saw a woman's body lying in their backyard. Robert immediately called 911.

Police drove to the Snyders' house and identified Simeneh's deceased body. Doctor Jocelyn Posthumus, an assistant chief medical examiner whom the trial court qualified as an expert in forensic pathology, performed an autopsy. Simeneh suffered a gunshot wound to her head that was caused by a bullet that entered her forehead, travelled in an "upward . . . trajectory" through her brain, and exited the back of her head. Although the gunshot wound ultimately caused Simeneh's death, it was not instantaneous, and given the brain structures impacted, Dr. Posthumus opined that Simeneh might have been "capable of conscious movement" for moments after the gunshot. A baseball cap Simeneh had worn was near her body in the Snyders' backyard. The cap had a hole in it surrounded by gunshot residue, indicating that the firearm was two or three feet away when fired.

Meanwhile, around 8:00 p.m. the previous night, Henok's younger brother, Girma, returned to the family house and saw that the front door was ajar. Girma entered and found Henok deceased, lying in a pool of blood just inside the front door. No one else was home. Girma immediately called 911.

Dr. Posthumus also performed an autopsy on Henok. Henok suffered from blunt force trauma to his forehead and multiple gunshot wounds. One gunshot wound was caused by a bullet that entered the back of his head and exited near his jawbone; another wound was caused by a bullet that entered the back of his neck, severed his brain stem, and exited near his eyebrow. Neither of those wounds had "stippling" from gunshot residue, indicating that the muzzle of the firearm was "at least two to four feet" from Henok's skin when fired. The gunshot wounds caused Henok's death, though Dr. Posthumus acknowledged that the blunt force trauma injury could have arisen "from a fight."

Fairfax County Detective Brian Byerson attempted "to locate" Nessibu in the days following the killings but was unsuccessful because he had "fled the country." The day after the killings, Nessibu bought a one-way plane ticket from Washington Dulles International Airport to Ethiopia. And two days after the killings, surveillance video from Dulles Airport recorded Nessibu boarding that flight. Detective Byerson did not have any contact with Nessibu until he was in custody years later.

While processing the crime scenes, police found seven empty cartridge cases and two bullets inside Henok's residence. One of the bullets had lodged in the ceiling and the other in a doorframe. Police also found an empty cartridge case on the ground near Simeneh's body in the Snyders' backyard. The cartridge cases at both scenes were of "the same caliber and make." Moreover, a firearm toolmark expert evaluated the cartridge cases and determined they were all fired by the same firearm. The expert also examined the bullets; he could not determine whether they had been fired from the same firearm but concluded that they were consistent with having been fired from a Glock 9-millimeter pistol.

About a week after the killings, police executed a search warrant on Nessibu's house. During the search, they found a pistol case that was manufactured by Glock in Nessibu's brother's room. It contained "assorted gun parts inside," including a barrel and suppressor; it also included a plastic baggie with the printed words, "Glock 9mm Black Fluted . . . ." A Fairfax County detective testified that it was a "gun box" for a "Glock handgun." Police seized the box but eventually returned it to Nessibu's brother.

A grand jury charged Nessibu with two counts of murder and related firearm charges, but after the trial court ordered the murder trials severed so that Nessibu could testify in one trial and remain silent in the other, the Commonwealth nolle prossed the charges. The Commonwealth later charged Nessibu with two counts of aggravated murder, two counts of first-degree murder, and use

of a firearm in the commission of Henok's homicide. The Commonwealth later charged Nessibu with an additional count of use of a firearm in the commission of a felony, related to Simeneh's homicide. A 12-day jury trial was scheduled.

Ten days before trial, the trial court heard Nessibu's motion for "Appropriate Relief." He argued that the "elevated" aggravated murder charges were "vindictive" because the Commonwealth had lost the argument on the motion to sever the original charges, there was no new evidence, and the Commonwealth sought a "tactical advantage" with charges that carried more severe sentences. The trial court agreed, finding that the Commonwealth's displeasure after the initial charges were severed was "beyond palpable." Accordingly, the court struck the aggravated murder charges.

Following that ruling, Nessibu again moved the trial court to sever the murder trials under the new indictments. He proffered that he intended to testify that he acted in self-defense when he killed Henok and that he wished to exercise his right to remain silent in the trial for Simeneh's homicide, requiring separate trials.

The trial court granted the motion and asked the parties which charges should be tried first. The Commonwealth asked the court to try Nessibu for Simeneh's homicide first so that he could remain silent during that trial and then testify during the second, consistent with his proffer. The Commonwealth asserted that if the court tried Henok's homicide first, and Nessibu testified during that trial, the Commonwealth would necessarily cross-examine him on facts related to Simeneh's homicide, which was inconsistent with his desire to remain silent. The Commonwealth also maintained that any statements Nessibu made during the trial on Henok's homicide could be admitted at a subsequent trial for Simeneh's homicide. The Commonwealth also argued that the "evidence" relevant to Henok's homicide also "serve[d] as motive" for the Simeneh homicide, and there were fewer contested "legal issues" related to Simeneh's homicide. Given that there was only

"a week" before trial, the Commonwealth wanted to try "the case where the legal issues [were] more easily settled."[3]

Nessibu, on the other hand, wanted a trial on Henok's homicide first because "it was the first in time." The trial court asked Nessibu for his rationale given his intention to testify during the trial for Henok's homicide because any statements he made during that trial could be admitted in a subsequent trial on Simeneh's homicide. Nessibu maintained that he could testify in the first trial without "a penalty in the other" because he could "assert his right to silence" outside of the jury's presence.

The Commonwealth responded that Nessibu may be approbating and reprobating because he had "raised the argument that he has to preserve his right against self incrimination," necessitating that the charges be severed, but if the Commonwealth attempted to introduce Nessibu's testimony during a trial for Henok's homicide during a later trial for Simeneh's homicide, that "tends to [eviscerate] his claim to remain silent." The Commonwealth contended that such potential "appellate issue[s]" could be avoided by trying Simeneh's homicide first. The Commonwealth also asserted that the legal issues regarding the relevance of Simeneh's homicide to Nessibu's "state of mind" during Henok's homicide was an issue that "merits being briefed," but there was no time to brief that issue before trial, so "if we want to go forward in one week, the clean case is the second one."

The trial court ordered that the Commonwealth try the charges for Simeneh's homicide first because it presented "fewer issues that need to be resolved in a relatively short period of time in which the" trial court would not "be available." The court emphasized that there were "no more

_____

[3]At that time, the Commonwealth perceived that there was no dispute that the evidence of Henok's homicide could be used to demonstrate motive in a trial for Simeneh's homicide, but there was disagreement on whether evidence of Simeneh's homicide and Nessibu's subsequent flight could be admitted to show premeditation for Henok's homicide.

motions days left" before trial, and proceeding on Henok's trial first might require "some additional issues that would require separate briefings and motions," but there was "no time to do that."

On the first day of the trial for Simeneh's homicide, Nessibu argued that the Commonwealth should not be allowed to present evidence of Henok's homicide or argue to the jury that because he killed Henok he had a motive to kill Simeneh. He maintained that such an argument would amount to the assertion that "[b]ecause he committed the first one, he committed the second one." Nessibu added that if the court had scheduled the trial on Henok's homicide first there would be no issue because the jury could decide his guilt on that charge first, and then it would be clear whether the Commonwealth could use evidence of that killing as motive in Simeneh's homicide. Nessibu asserted that whether he was guilty of a crime for killing Henok was a jury question, but he could not "defend" that allegation of motive in this trial, so the Commonwealth should not "get to argue to the jury" that because he killed Henok he had motive to kill Simeneh. The trial court disagreed and ruled that the Commonwealth could "rely upon that" to show "motive." At that time, Nessibu did not ask the trial court to reconsider its decision to try him for Simeneh's homicide first.

During the trial, the Commonwealth sought to introduce a picture of the "Glock box" and the included firearm parts that police found while searching Nessibu's house. Nessibu objected to the evidence as irrelevant, arguing that everyone has "access to a weapon in this country," Glock pistols were very common, and the presence of a "Glock box" in Nessibu's brother's room did not "prove" anything. The trial court overruled the objection, finding that the evidence was probative of Nessibu's "access to a weapon."

After the close of the Commonwealth's case-in-chief, Nessibu sought to admit an excerpt from one of the Commonwealth's pre-trial pleadings. In the pleading's proffered statement of facts, the Commonwealth asserted, in part:

> After being gone a short while, the defendant and . . . Simeneh
> rushed back to the vehicle containing . . . Dalton and . . . Kamara.

> The defendant ordered . . . Dalton to drive them out of there stating, "I hit him, I hit him. He rushed me, drive off." Upon questioning . . . Simeneh, who was hysterical and hyperventilating, she stated that [Nessibu] shot [Henok], he is bleeding out of his head, and he is dead. . . . Dalton and . . . Kamara ordered [Nessibu] and . . . Simeneh out of the car and left the scene. This was the last time . . . Simeneh was seen alive.

Nessibu argued that the pleading was an admission of a party opponent because it contained declarations of fact that the Commonwealth, through its agent, "says happened." The Commonwealth disagreed, contending that it was a responsive pleading and that, regardless, it was "hearsay within hearsay . . . because it characterizes the testimony of multiple witnesses." The trial court excluded the evidence, finding that there were multiple levels of hearsay and that the admission of a party opponent exception did not apply because the asserted facts were not within the Commonwealth's knowledge.

After the close of all the evidence, Nessibu asked the trial court to provide the following jury instruction:

> [T]he prosecution claims that the defendant shot and killed Henok . . . and that this was the motive for his killing . . . Simeneh.
>
> When considering whether the prosecution's evidence has overcome the presumption of innocence beyond a reasonable doubt as to the allegation of motive you are to consider, in this circumstantial evidence case, whether the prosecution's evidence has excluded every reasonable theory of innocence beyond a reasonable doubt and may also consider if the accused acted in self-defense in regard to Henok . . . then that was no crime.
>
>> The law of self-defense is law of necessity . . . if a defendant reasonably fears death or serious bodily harm to himself from the victim, he has the right to defend against that danger, and may always act upon the reasonable appearance of danger. Whether the danger is reasonably apparent to the defendant is always to be determined from the viewpoint of the defendant at the time he acted. It is the defendant's view at the time he acted that is considered and not the view of someone else. The defendant may not be at fault in bringing on the difficulty.

> A suspicion of guilt, however strong, or even a probability of guilt, is insufficient to support a criminal conviction.

Nessibu asserted that he was "on trial" for Henok's murder too, not just Simeneh's, and the jury should be instructed "on the possibility of self-defense" in Henok's killing because if the Commonwealth attempts to "prove motive" it had "to prove it beyond a reasonable doubt." Nessibu asserted that the Commonwealth "was asking the jury to find that he committed the murder of Henok," but he was "not allowed to defend against" that allegation because he could not "testify about it." The trial court found that nothing prohibited Nessibu from testifying. Nessibu responded that it would be a "different situation" if the court had tried him on Henok's murder first.

The trial court refused Nessibu's proposed instruction and instead instructed the jury that "[t]o prove the charge of murder the Commonwealth does not have to prove a motive for the killing. The presence or absence of a motive may be considered in arriving at your verdict." The court also instructed the jury on self-defense, explaining that because the Commonwealth claimed that the defendant "killed Henok . . . and that this was the motive for killing . . . Simeneh," the jury could "consider the defense of self defense as to the killing of Henok." The trial court also instructed the jury on Nessibu's absolute right not to testify.

After closing argument and deliberation, the jury convicted Nessibu of first-degree murder and use of a firearm in the commission of a felony.[4] The trial court then scheduled a jury trial for Henok's homicide for February 2023.

Before the second trial, Nessibu moved *in limine* to exclude evidence of Simeneh's murder in the trial on Henok's homicide. He argued that granting the motion was necessary to preserve his ability to testify regarding Henok's homicide while remaining silent regarding Simeneh's murder.

---

[4] As noted above, Nessibu was separately indicted for the firearm charge related to Simeneh's murder. The trial court entered a separate sentencing order convicting Nessibu of that firearm charge, which Nessibu challenged in a separate notice of appeal. The parties filed identical briefs in both appeals.

After a hearing, the trial court granted the motion, finding that Nessibu had a continuing Fifth Amendment right to remain silent regarding Simeneh's murder and an equally important right to testify regarding Henok's homicide. The court reasoned that if the Commonwealth presented evidence of Simeneh's murder during the second trial, Nessibu would be unable to respond to that evidence without waiving his Fifth Amendment right. And the trial court found that the evidence of Simeneh's murder was not significantly probative of any material issue regarding Henok's homicide. The trial court ruled that the Commonwealth would have to prove its case in the second trial "based on the events that occurred" before "the second killing." The trial court agreed that Nessibu and Simeneh's statements when they returned to Dalton's car were admissible and that the Commonwealth would end its case when they exited Dalton's car after the killing. The parties also agreed to stipulate for the second jury that Simeneh was unavailable to testify.

The evidence during the trial for Henok's homicide largely tracked that adduced in the first trial. After the close of the evidence and argument by counsel, the second jury convicted Nessibu of voluntary manslaughter and use of a firearm in the commission of a felony. After a sentencing hearing for all charges, the trial court sentenced Nessibu to life imprisonment for first-degree murder, ten years' incarceration with three years suspended for voluntary manslaughter, three years' incarceration for the first firearm offense, and five years' incarceration for the second firearm offense. Nessibu appeals.

ANALYSIS

I. Order of Trials

Nessibu argues that the trial court violated his constitutional rights by "requiring the Simeneh trial to proceed first." He maintains that he wanted to testify in the Henok trial first, attain an acquittal based on that testimony, and then use that acquittal to undermine the Commonwealth's argument that he murdered Simeneh because she had witnessed him commit a "heinous crime"

- 11 -

against Henok. Thus, he asserts that due process and his rights to testify, remain silent, and present evidence in his defense required Henok's homicide to be tried first. He acknowledges that the jury in the Simeneh trial was instructed on heat of passion and self-defense in relation to the Henok homicide. But he argues that those instructions were "unmoored" from his testimony about why he killed Henok, which he could not give during the Simeneh trial "without compromising his right to remain silent as to the Simeneh homicide."

It is well-established that courts have "[c]ertain implied powers" that are "necessary to the exercise of all others." *Ferrara v. Commonwealth*, 299 Va. 438, 447 (2021) (alteration in original) (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812)). Among those, courts have the authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962)). Indeed, a court has "broad discretion" and "inherent authority to administer cases on its docket." *Yarbrough v. Commonwealth*, 258 Va. 347, 361 (1999). Consistent with those principles, the trial court in this case had broad discretion when scheduling Nessibu's trials, although that discretion had to be exercised with due regard to Nessibu's constitutional rights. *Cf. Gilchrist v. Commonwealth*, 227 Va. 540, 546-47 (1984) (reviewing for an abuse of discretion a trial court's ruling on a defendant's motion for a continuance so that he could investigate evidence and exercise his constitutional right "to call for evidence in his favor" (quoting *Cremeans' Case*, 104 Va. 860, 863 (1905))). Thus, we review the constitutional components of Nessibu's argument de novo and the trial court's scheduling for an abuse of discretion. *Yarbrough*, 258 Va. at 361; *Vay v. Commonwealth*, 67 Va. App. 236, 258 (2017) (citing *Shivaee v. Commonwealth*, 270 Va. 112, 119 (2005)).

Criminal defendants have the right "to testify in [their] own defense, or to refuse to do so." *Rock v. Arkansas*, 483 U.S. 44, 53 (1987) (quoting *Harris v. New York*, 401 U.S. 222, 225 (1971)). Choosing between those two rights is a "strategic and tactical decision[]" that a defendant should

make with the advice of his attorney. *Robinson v. Commonwealth*, 72 Va. App. 244, 248 (2020) (citing *Florida v. Nixon*, 543 U.S. 175, 187 (2004)). Similarly, a criminal defendant has the constitutional right to present evidence in his defense. *Ramsey v. Commonwealth*, 63 Va. App. 341, 353 (2014) (citing Va. Const. art. I, § 8). The right to present evidence in one's defense, however, is not unlimited and must comply with "rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

Whether to move to sever multiple offenses is another "classic pre-trial tactical decision." *Robinson*, 72 Va. App. at 249. Indeed, given that trying offenses together or separately can directly impact strategy, tactics, and even the entire theory of a defense, we have held that the decision on whether to sever charges rests not with a defendant, but with his attorney. *Id.* And as part of the tactical calculus, the defense should consider the impact severance could have on the exercise of a defendant's constitutional rights. *See Currier v. Virginia*, 585 U.S. 493, 502 (2018). For example, the United States Supreme Court has held that after a defendant "wins a potential benefit" by having multiple charges severed, his "consent" to multiple trials "dispels any specter of double jeopardy abuse that holding two trials might otherwise present." *Id.*

Here, Nessibu elected to seek severance of the charges related to Henok's homicide from the charges related to Simeneh's murder. Demonstrating that his motion was the product of trial strategy, Nessibu argued that severance was necessary because he wanted to testify in the Henok trial but remain silent in the Simeneh trial. The trial court granted the motion, awarding Nessibu the "potential benefit" in strategy that he sought. *Id.* But that benefit came with concerns about the best way to secure the orderly and expeditious adjudication of the charges while honoring Nessibu's rights. It also raised immediate questions from the trial court regarding which charges should be tried first.

Generally, "the institution of criminal charges, as well as their order and timing, are matters of prosecutorial discretion." *Bradshaw v. Commonwealth*, 228 Va. 484, 492 (1984) (citing *Hensley v. City of Norfolk*, 216 Va. 369, 372-73 (1975)). Nevertheless, courts generally employ a balancing test "to assess the competing interests of the State and the criminal defendant" when "scheduling trials . . . after severance" of multiple charges. *State v. Rhinehart*, 153 P.3d 830, 836 (Utah Ct. App. 2006) (citing *State v. Walland*, 555 So. 2d 478, 481-82 (La. Ct. App. 1989)); *see also Gilchrist*, 227 Va. at 546-47 (balancing the Commonwealth's witness availability against the defendant's right to present evidence in his defense when reviewing a trial court's ruling on the defendant's motion for a continuance). Such balancing is a case-specific inquiry that will focus on the unique facts and posture of a given case. *See Rhinehart*, 153 P.3d at 836-37. Absent the abuse of discretion, the court's judgment will not be reversed. *Yarbrough*, 258 Va. at 361; *Gilchrist*, 227 Va. at 546-47. Here, the record reveals that the trial court balanced the parties' relative interests when scheduling the trials and did not abuse its discretion by ordering the trial on Simeneh's murder first.

To be sure, Nessibu desired to first seek an acquittal for Henok's homicide by relying on his own testimony that he acted in self-defense, and then to use that acquittal as evidence to undermine the Commonwealth's motive argument in the Simeneh trial. A defendant's right to present evidence in his own defense, however, must be considered alongside the Commonwealth's interest in the orderly prosecution of and presentation of evidence in criminal trials. *Taylor v. Illinois*, 484 U.S. 400, 411 (1988). In addition, as the trial court noted, if Nessibu testified in a trial on Henok's homicide first, any statements he made during that trial—including his admission that he actually shot Henok, albeit in self-defense—could be used against him in a subsequent trial on Simeneh's murder. Indeed, the Commonwealth emphasized that if Henok's homicide were tried first and Nessibu testified, the Commonwealth would seek to cross-examine him about Simeneh's murder

even though he wanted to remain silent regarding that charge. The trial court properly weighed those concerns when scheduling the trials.

Of course, Nessibu was not guaranteed an acquittal in the Henok homicide trial, nor did he demonstrate that an acquittal was likely when asking the trial court to schedule that trial first. Regardless, the potential effect of a hypothetical acquittal in the Henok trial on the Commonwealth's motive argument in a subsequent trial for Simeneh's murder was open to ready question. The trial court pointed out that Nessibu could have been motivated to murder Simeneh, the only witness to the first killing, even if he was personally convinced that he had killed Henok in self-defense, for with the only witness to the first homicide dead, Nessibu might "avoid" any police investigation, charges, or even needing to assert that he killed Henok in self-defense. Indeed, when considered together with evidence that demonstrated that Nessibu fled from the scene of the first murder and used his firearm to coerce Dalton into driving away, the jury could have inferred that he had a guilty conscience, at least in the moments immediately after the first homicide, regardless of whether he was legally acquitted on self-defense grounds. *Palmer v. Commonwealth*, 14 Va. App. 346, 348-49 (1992) ("[I]t is . . . universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct are admissible as evidence of consciousness of guilt." (first alteration in original) (quoting *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991))).

Moreover, in properly sequencing the two trials, the parties' disagreement regarding the admissibility of certain evidence during the trial on Henok's homicide had to be weighed relative to the scheduled date of the first trial. Specifically, the Commonwealth wanted to argue that the "second murder and subsequent flight" were evidence of premeditation in the first homicide, and given Nessibu's objection to such evidence, the Commonwealth wanted to submit pre-trial briefs on that issue. Yet, at the time the trial court had to decide which charges to try first, trial was only ten

days away. Neither the court nor the parties had time to submit or review pre-trial briefs and "resolve" the evidentiary issue in that time. Given a court's inherent authority to manage its docket, the existence of an unresolved evidentiary issue supports the trial court's conclusion that the "cleaner" trial to proceed on with only ten days was Simeneh's. *Ferrara*, 299 Va. at 447 (providing that courts should manage cases "to achieve the orderly and expeditious disposition of cases"); *see also Gilchrist*, 227 Va. at 546 (recognizing the legal system should seek to administer "speedy justice").

Finally, the record demonstrates that Nessibu *chose* to exercise his right to remain silent in the Simeneh trial; he was not prohibited from testifying.[5] Often, a criminal defendant will have to choose "between asserting a defense based upon his own testimony or remaining silent"; such a choice is not uncommon. *United States v. Wright*, 88 F. App'x. 30, 31 (5th Cir. 2004). A defendant faced with that choice is not denied his constitutional rights to testify or "present a defense" merely because he elects to remain silent. *Id.* Here, Nessibu could have testified during the Simeneh trial that he killed Henok in self-defense and thereby exercised his constitutional right to present evidence in his defense. That he chose to remain silent instead does not demonstrate that his rights to testify and present evidence were violated, but only that his preferred trial tactics were frustrated.

In sum, Nessibu sought a tactical benefit by asking the trial court to sever the charges against him. After he obtained that potential benefit, the trial court had to weigh the various circumstances when ordering the separate trials. The court carefully balanced the relative interests with an eye toward protecting Nessibu's constitutional rights and ultimately concluded that

---

[5] During the trial on Simeneh's murder, Nessibu argued that he had not been "allowed to defend" against the allegation that he killed Henok. The trial court adamantly rejected that assertion, stating "don't tell me you're not allowed to defend against it" and that it was his "choice" not to testify in the Simeneh trial. The court reiterated that it had not "prevented" Nessibu from testifying.

Simeneh's murder would be tried first.  Neither Nessibu's argument nor the record reveals any error or abuse of discretion in the trial court's judgment.

II.  Evidentiary Rulings

Determining "the 'admissibility of evidence is within the discretion of the trial court,' and an appellate court will not reject such decision absent an 'abuse of discretion.'"  *Williams v. Commonwealth*, 71 Va. App. 462, 487 (2020) (quoting *Tirado v. Commonwealth*, 296 Va. 15, 26 (2018)).  "The abuse of discretion standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not."  *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)).  "[T]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that the [reviewing] court does not reverse merely because it would have come to a different result in the first instance."  *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (alterations in original) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)).  "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred."  *Bista v. Commonwealth*, ___ Va. ___, ___ (Nov. 14, 2024) (quoting *Commonwealth v. Swann*, 290 Va. 194, 197 (2015)).

A.  Photograph of the "Glock Box"

Nessibu argues that the trial court abused its discretion by admitting "a picture of a storage box for a Glock pistol, which box was not maintained or admitted as evidence."  He contends that no evidence demonstrated that "the particular Glock associated with the box was a nine-millimeter handgun like the one used" to murder Simeneh and that no evidence showed that he possessed a Glock specifically, as Dalton testified only that Nessibu was carrying an unidentified "black pistol" when he returned to the car from Henok's house.  Thus, he maintains that the image was unduly

prejudicial given its minimal probative value and that without the image "the Commonwealth could not have persuasively argued that . . . Nessibu had access to a nine-millimeter Glock handgun."

Nessibu's argument is not preserved for appeal under Rule 5A:18. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. The "contemporaneous objection requirement . . . allow[s] the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Hogle v. Commonwealth*, 75 Va. App. 743, 755 (2022) (quoting *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015)). "Specificity and timeliness undergird the contemporaneous-objection rule, animate its highly practical purpose, and allow the rule to resonate with simplicity." *Id*. (quoting *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019)). "Not just any objection will do. It must be both specific and timely—so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Bethea*, 297 Va. at 743). "If a party fails to timely and specifically object, he waives his argument on appeal." *Id.* (citing *Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009)).

At trial, Nessibu objected to admitting the picture of the Glock box solely on relevance grounds, arguing that everyone has "access to a weapon in this country," Glock pistols were very common, and the presence of a "Glock box" in Nessibu's brother's room did not "prove" anything. He did not argue, as he does on appeal, that the image was not admissible because its probative value was substantially outweighed by its undue prejudice. Under Virginia Rule of Evidence 2:402(a), "[a]ll relevant evidence is admissible, except as otherwise provided," and "[e]vidence that is not relevant is not admissible." Addressing a related but distinct concept, Virginia Rule of Evidence 2:403(a) provides that relevant evidence may be "excluded if . . . the probative value of the evidence is *substantially* outweighed by . . . the danger of *unfair* prejudice." (Emphases added).

"Making one specific argument on an issue does not preserve a separate legal point on the same issue for review." *Edwards v. Commonwealth*, 41 Va. App. 752, 760 (2003) (en banc). Nessibu's trial objection was limited to an argument under Rule 2:402(a), so his appellate argument under Rule 2:403(a) is not preserved.

Recognizing the potential default, Nessibu asks us to consider his argument under Rule 5A:18's ends-of-justice exception. "The ends of justice exception is narrow and is to be used sparingly." *Holt v. Commonwealth*, 66 Va. App. 199, 214 (2016) (en banc) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 220 (1997)). To "avail oneself of the exception, a defendant must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Redman*, 25 Va. App. at 221 (citing *Mounce v. Commonwealth*, 4 Va. App. 433, 436 (1987)). It is not enough for an appellant "to merely assert a winning argument on the merits—for if that were enough[,] procedural default 'would never apply, except when it does not matter.'" *Winslow v. Commonwealth*, 62 Va. App. 539, 546 (2013) (quoting *Alford v. Commonwealth*, 56 Va. App. 706, 710 (2010)).

When considering the ends-of-justice exception, we examine whether there has been a "'grave injustice' or a wholly inexcusable 'denial of essential rights.'" *Id.* at 546-47 (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 513 (2009)). An appellant bears a "heavy" burden to demonstrate that a miscarriage of justice has occurred. *Holt*, 66 Va. App. at 210 (quoting *Brittle*, 54 Va. App. at 514). Generally, meeting that burden requires an appellant to "point . . . to a particular place in the record" affirmatively establishing a manifest injustice. *Brittle*, 54 Va. App. at 519 (declining to apply the exception because, in part, the appellant "failed to point" this Court "to a place in the record that affirmatively establishes that an element of the offense did not occur").

The "responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the trial court." *Walker v. Commonwealth*, 302 Va.

304, 320 (2023) (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 715 (2008)). "When balancing these considerations, it is of course true that 'all probative direct evidence generally has a prejudicial effect to the opposing party.'" *Id.* (quoting *Lee v. Spoden*, 290 Va. 235, 251 (2015)). Thus, "unfair prejudice" under Rule 2:403(a) "refers to the tendency of some proof to inflame the passions of the trier of fact, or to invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Id.* "The term 'speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt [or liability] on a ground different from proof specific to the [case elements].'" *Id.* (alterations in original) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

Nessibu's argument fails to satisfy his heavy burden of demonstrating that a manifest injustice occurred when the trial court admitted the photograph of the Glock box into evidence. The photograph did not conclusively prove that Nessibu used the associated pistol to murder Simeneh. But as the trial court found, it was relevant because it had a "tendency" to show that Nessibu had access to a handgun, and a plastic bag within the box was printed with the words "Glock 9mm . . . ," which tended to demonstrate that the box contained gun parts of the same caliber used in the murder. *See Gilliam v. Immel*, 293 Va. 18, 28 (2017) (quoting Va. R. Evid. 2:401). Moreover, the limitations of the evidence's probative value were presented to the jury, as Detective Roberts admitted that Glock handguns were very common in the United States and that police returned the Glock box to Nessibu's brother before trial. Given those disclosures, there was little to no danger that photograph of a "Glock box" would inflame the jury's passions or lure the jury into rendering an infirm judgment. Thus, the ends-of-justice exception is inapplicable, and Rule 5A:18 bars our consideration of Nessibu's argument on appeal.

B. Admission of Party Opponent

Nessibu argues that the trial court abused its discretion by excluding the Commonwealth's pre-trial pleading from the evidence. He contends that the pleading was admissible as a party opponent admission and that to the extent it contained "hearsay within hearsay," it was admissible "as a prior inconsistent statement" to impeach Dalton's testimony. He maintains that the pleading contradicted Dalton's testimony in two ways. First, it asserted that when Nessibu returned to Dalton's car after killing Henok, he said, "I hit him, I hit him. *He rushed me*, drive off." (Emphasis added). And second, the pleading asserted that Dalton and Kamara had ordered Nessibu and Simeneh out of the car before "[leaving] the scene," which was inconsistent with Dalton's testimony that they left his car "without any order to do so."

We need not decide whether the Commonwealth's pleading could have been admitted as the admission of a party opponent because any error in the trial court's ruling was harmless. An appellate court "will not reverse a trial court for evidentiary errors that were harmless to the ultimate result." *Shifflett v. Commonwealth*, 289 Va. 10, 12 (2015). Rather, if "it plainly appears from the record and the evidence . . . that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed." *Moore v. Joe*, 76 Va. App. 509, 516-17 (2023) (alteration in original) (quoting Code § 8.01-678).

Non-constitutional error "is harmless if we can be sure that it did not 'influence the jury' or had only a 'slight effect.'" *Shifflett*, 289 Va. at 12 (quoting *Clay v. Commonwealth*, 262 Va. 253, 260 (2001)). An evidentiary error may be "harmless 'if "other evidence of guilt is 'so overwhelming and the error so insignificant by comparison that the error could not have affected the verdict,'" or "even if the evidence of the defendant's guilt is not overwhelming," if the excluded evidence would have been "merely cumulative of other, undisputed evidence."'" *See*

*Salahuddin v. Commonwealth*, 67 Va. App. 190, 212 (2017) (quoting *McLean v. Commonwealth*, 32 Va. App. 200, 211 (2000)).

Here, the jury heard the recorded interview between Dalton and the police, which occurred about a week after the killings. Dalton reported that Nessibu had stated, "I hit him. I hit him. *He rushed me*. I hit him." During cross-examination at trial, Dalton conceded that "the clip" recorded him relaying Nessibu's claim that Henok had "rushed" him. Thus, the excluded pleading was cumulative of already emphasized evidence. Although the pleading also asserted that Dalton and Kamara had ordered Nessibu and Simeneh out of the car before leaving the scene, which was inconsistent with Dalton's testimony that they left his car at Nessibu's instruction after driving for several minutes, that detail was insignificant compared to the overall strength of the Commonwealth's case as developed in the seven-day jury trial and did not relate to any elements of the charged offenses. Moreover, the pleading and Dalton's testimony consistently provided that Nessibu and Simeneh left Dalton's vehicle simultaneously, regardless of whether they did so on Dalton's orders. Consequently, any error in refusing to admit the pleading into evidence did not influence the jury's verdict; thus, it was harmless.

III. Jury Instruction

"Our 'sole responsibility' in reviewing a challenge to jury instructions 'is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Taylor v. Commonwealth*, 77 Va. App. 149, 166 (2023) (quoting *Molina v. Commonwealth*, 272 Va. 666, 671 (2006)). Generally, a "trial court 'has broad discretion over whether to give or deny proposed jury instructions.'" *Id.* (quoting *Huguely v. Commonwealth*, 63 Va. App. 92, 129 (2014)). But whether a proposed instruction accurately states the law is reviewed de novo. *Barney v. Commonwealth*, 69 Va. App. 604, 609 (2019) (citing *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014)).

Nessibu argues that the trial court erred by refusing his proposed jury instruction that stated the Commonwealth was required "to prove motive beyond a reasonable doubt" because it had "put motive at issue." He maintains that because the evidence against him was "entirely circumstantial," Supreme Court precedent required the Commonwealth "to prove beyond a reasonable doubt that *motive*, time, place, means, and conduct concur in pointing out the accused as the perpetrator of the crime." Because the Commonwealth "endeavored to prove motive" in this case, Nessibu asserts that it had to do so "beyond a reasonable doubt," and the trial court should have granted his proposed instruction.

Nessibu's argument misconstrues the law. "Motive has never been a requisite element of the crime of murder in Virginia." *Cantrell v. Commonwealth*, 229 Va. 387, 397 (1985) (citing *Van Dyke v. Commonwealth*, 196 Va. 1039, 1046 (1955)). Thus, the Commonwealth need not prove motive beyond a reasonable doubt to sustain a murder conviction. *Id.* at 398. Yet Nessibu points to a line of decisions addressing circumstantial cases, which provide that when "the evidence is wholly circumstantial . . . all necessary circumstances proved must be consistent with guilt . . . and exclude every reasonable hypothesis of innocence." *Inge v. Commonwealth*, 217 Va. 360, 366 (1976) (citing *Boykins v. Commonwealth*, 210 Va. 309, 312 (1969)). "The burden is upon the Commonwealth to prove beyond a reasonable doubt that *motive*, time, place, means, and conduct concur in pointing out the accused as the perpetrator of the crime." *Id.* (emphasis added).

The Supreme Court expressly rejected this same argument in *Cantrell*, holding that it confuses "the species of circumstances which may or may not be available for proof in any given case, with the elements of the crime, which must each be proved in every case if a conviction is to be had." 229 Va. at 397. Thus, "[a]lthough the rule as to cases based entirely on circumstantial evidence is that necessary circumstances must be consistent with guilt and inconsistent with innocence, all of the circumstances of time, place, *motive*, means and conduct do *not* have to be

proved beyond a reasonable doubt in every case." *Stevens v. Commonwealth*, 8 Va. App. 117, 121 (1989) (emphasis added) (citing *Cantrell*, 229 Va. at 398). The question in circumstantial evidence cases is merely whether the various circumstances, to the extent they were in fact proven, establish "the defendant's guilt beyond a reasonable doubt," excluding all hypotheses of innocence. *Id.*

Under settled precedent, the trial court properly instructed the jury that "[t]o prove the charge of murder the Commonwealth does not have to prove a motive for the killing. The presence or absence of a motive may be considered in arriving at your verdict." Nessibu's proposed instruction, by contrast, did not accurately state the law, and the trial court did not abuse its discretion by refusing it.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*